IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SHARON MARTIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 2:06-cv-2277-TMP |
| ) | |
| ASCENSION HEALTH, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This cause is before the court on the motion for summary judgment filed by the defendant, Ascension Health ("Ascension"), on August 14, 2007. The matter has been fully briefed. The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

**I.  SUMMARY JUDGMENT STANDARD**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions

1

on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS

The following facts are relevant to the instant motion for summary judgment.  The fact are undisputed or, if disputed, are viewed in the light most favorable to the non-movant.

Plaintiff Sharon Martin asserts breach-of-contract and bad-faith claims arising from the denial of her application for benefits under Ascension Health's Long Term Disability Plan ("the Plan").  Martin is an insured under the benefit plan available through her former employer, St. Vincent's Hospital ("St. Vincent's).  The court determined, in ruling on defendant's motion to strike plaintiff's jury demand, that the Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  The plan sponsor and administrator is defendant Ascension Health ("Ascension").  Ascension delegated the administration of claims for benefits under the Plan to Sedgwick Claims Management Services, Inc., ("Sedgwick").[1]  Sedgwick was given discretionary authority to determine eligibility for the LTD benefits under the Plan.

The Plan provides for two periods of LTD benefits.  For purposes of the first 24-month period of disability, the term "disability or disabled" is defined by the Plan as meaning that: "due to an injury or sickness, the Participant requires the regular care and attendance of a licensed physician and ... is unable to perform each of the material Duties of the Participant's Regular Occupation."  After 24 months of disability payments are made pursuant to the first definition, the Plan employs a more restrictive definition of disability, requiring that "the Participant must be unable to perform any Gainful Work or Service for which Participant is reasonably qualified taking into consideration

---

[1] Defendant Ascension Health does not dispute that it is liable for the conduct of Sedgwick.  Accordingly, the terms Ascension Health, Sedgwick, and defendant are interchangeable for purposes of this motion.

the Participant's training, education, experience and past earnings." (Ex. F, Notice of Removal, p. 2).

  Martin worked as a registered nurse at St. Vincent's for about 10 years. Her last day of work was April 7, 2002. On April 8, 2002, plaintiff was admitted to St. Vincent's and underwent cardiac catheterization and balloon angioplasty, and a stent was placed in her proximal left descending coronary artery. Plaintiff filed a claim for long-term disability ("LTD") benefits pursuant to the plan. Her initial claim was approved, and she began receiving benefits on or about July 7, 2002, after the 90-day elimination period.[2] She continued to receive LTD benefits from Ascension for 24 months, until July 6, 2004. The issue of whether Martin was disabled, and therefore entitled to benefits, during the first 24 months is not in dispute.[3] This case involves only the question of whether Martin's impairment constituted a "disability" under the Plan's more restrictive definition that governed her eligibility after 24 months had elapsed. Relevant to this question is Martin's health history, although the court notes that only the parts of plaintiff's health history that were provided to Sedgwick can be used to evaluate defendant's conduct in denying a claim.[4]

---

  [2] It is not clear whether the 90-day period is a period in which short-term disability coverage applied, or whether long-term benefits simply did not become available until the expiration of a 90-day term. The only benefits at issue in the instant action, however, are those benefits plaintiff asserts she is entitled to **after** July 7, 2004.

  [3] While the defendant did at some point dispute the payment of benefits during the last few months of the first 24 months, that question was ultimately resolved in favor of the plaintiff, and it appears that plaintiff was paid all benefits due under the plan up to the expiration of the 24-month period.

  [4] This court does not determine whether Ms. Martin could prove that she is or was "disabled." Under ERISA, the court's only function is to determine whether Sedgwick's decision to deny benefits was "wrong," and, if wrong, whether the decision was nonetheless "reasonable." Consequently, the court reviews the information about Ms. Martin's health that was made available

Martin was first hospitalized on April 8, 2002, for the cardiac catheterization, balloon angioplasty, and stent placement. She was treated by a cardiologist, Dr. Michael Parks. She was discharged on April 11, 2002, and her discharge diagnoses included unstable angina, diabetes, peripheral neuropathy, and sleep apnea. She visited Parks again on April 29, 2002, reporting shortness of breath, and continued chest pain. Ms. Martin was readmitted by St. Vincent's on May 2 2002, and Dr. Parks performed percutaneous transliminal coronary angioplasty and "stenting of the diagnonal." She returned to Dr. Parks on May 29, 2002, complaining of chest pain, and, on June 2, 2002, underwent another left heart catheterization, a coronary angiography, and a left ventriculography. Tests after the procedure showed diffuse nonobstructive coronary disease, normal systolic left ventricular function, no evidence of restenosis, and elevated left ventricular end diastolic pressure compatible with diastolic dysfunction.

On June 24, 2002, Ms. Martin visited her internist, Dr. David Hall. He noted that Ms. Martin told him she had been treated by Dr. Michael Hammer for degenerative joint disease. Dr. Hall listed Ms. Martin's conditions as degenerative joint disease of the lumbar spine, ischemic heart disease (which he identified as stable), diabetes mellitus, GERD, hyperlipidemia, and depression. On that same date, Ms. Martin also saw Dr. Parks, who noted that her chest pain was "markedly improved." She complained to Dr. Parks that she suffered from fatigue and decreasing exercise capacity. He decreased her intake of beta-blockers, to which he attributed the fatigue.

---

to the defendant.

On July 23, 2002, Ms. Martin returned to Dr. Hall, and complained of lower back pain and swelling in her legs. Dr. Hall noted that Dr. Hammer had declined to prescribe a Duragesic patch for the back pain. Dr. Hall's notes from that visit remarked on chronic back pain, peripheral edema, rhinitis, diabetes mellitus, and hyperlipidemia.

On July 30, 2002, Ms. Martin first applied for LTD benefits. The Plan requires that a claimant, in order to obtain benefits, submit objective medical documentation to support a diagnosis of a disability as defined in the Plan. In support of her claim, Ms. Martin described her disability as "heart attack with angioplasty of LAD," angioplasty of another artery, and "arteries 40% blocked." On August 25, 2002, Dr. Hall submitted in plaintiff's behalf an Attending Physician Statement, stating that Ms. Martin's primary diagnosis was chronic pain and degenerative joint disease, with a secondary diagnosis of ischemic heart disease. On August 28, 2002, Sedgwick approved the LTD benefits, retroactive to July 7, 2002.

On September 6, 2002, Ms. Martin visited Dr. Hall and complained of lower back pain. He prescribed a stronger Duragesic patch, and noted that Ms. Martin was "otherwise doing fairly well." On December 6, 2002, Ms. Martin again saw Dr. Hall, complaining of back pain. She received two injections: Kenalog and Lidocaine. At that time, her heart disease was termed "stable," and she denied having chest pain. Her blood tests revealed that her lipids were excellent. Dr. Hall completed another Attending Physician Statement on that date, indicating a primary diagnosis of degenerative joint disease of the lumbar spine, and a secondary diagnosis of Type II diabetes and ischemic heart disease. He further stated that plaintiff was not able to "return to work as a registered nurse."

On February 17, 2003, Ms. Martin was admitted to St. Vincent's again, complaining of chest pain. She underwent another left heart catheterization, coronary angiogram, and left ventriculogram. Dr. Parks treated her, and discharged her on February 17, 2003, stating that the chest pain had resolved and was probably non-cardiac in nature.

On March 13, 2003, Dr. Parks completed an Attending Physician's Statement, stating that Ms. Martin was disabled from her nursing job. His primary diagnosis was ischemic heart disease, and his secondary diagnosis was diabetes, but he noted that Ms. Martin also complained of back pain.

In April 2003, Ms. Martin complained to Dr. Parks that she had a "full feeling" in her chest, leg edema, and shortness of breath. Dr. Parks changed her medication. In a follow-up visit on May 29, 2003, she reported that the shortness of breath and edema had not increased, and Dr. Parks increased her new medication.

On June 4, 2003, Ms. Martin saw Dr. Hall, complaining of peripheral edema, back pain, depression, and low energy. He noted that her hypertension was "adequately controlled."

On July 2, 2003, Ms. Martin returned to St. Vincent's with complaints of increased chest pain. She was admitted, and another catheterization was performed.

Ms. Martin returned to Dr. Hall on July 22, 2003, and seemed to be improving. The clinic notes make no mention of any complaints regarding her back, and state that her chest pain "has now resolved."

She visited Dr. Hall again on October 21, 2003, and reported that she had stopped taking diuretics because of the cost of the medications. She also complained of low back pain and pain in

her legs. Dr. Hall's assessment on that date indicated "good control of her sugar" with regard to her diabetes, "good control" of her hyperlipidemia, a B12 deficiency for which he gave her an injection; and ischemic heart disease with angina, for which he recommended getting her back on a diuretic.

On November 5, 2003, Ms. Martin was notified by the Social Security Administration that she was disabled within the meaning of the Social Security Act.

On March 4, 2004, Sedgwick referred Ms. Martin's file to an independent physician, Dr. Robert Petrie, for review of her claim for LTD. He reviewed the records of Drs. Hall and Parks, and the corresponding test results. He noted:

> There are few orthopedic notes included in the file and they do not demonstrate the presence of neuromuscular impairments. Degenerative joint disease is a manifestation of the aging process, which is present in the population of individuals both with and without pain complaints. There are no X-ray reports showing joint deformity or demonstrating the presence of neurological deficits. There are also no records provided to document or substantiate the diagnosis of a peripheral neuropathy. There are no reported trophic changes, no changes in vibratory perception, no proprioceptive changes reported, no reflex abnormalities, and no dermatomal sensory deficits. Similarly, there are no EMB/NCT abnormalities or consultation reports to corroborate or demonstrate any impairment related to the diagnosis of peripheral neuropathy.

(Defendant's Ex. A, at Bates No. 0307-08). Dr. Petrie issued a report on March 15, 2004, stating that objective findings from the record indicated that Martin had coronary artery disease, which was reportedly stable. However, he noted the absence of objective medical evidence of "orthopedic impairment." He noted that:

> The only objective evidence provided in the records regarding the diagnosis of osteoarthritis is that of some reported decreased range of motion due to "pain," and

9

> a right knee effusion noted on 12/06/02. There is no further evidence of joint deformity provided in the records or any radiologic or consultative reports. The objective findings therefore do not support an inability to perform job duties.

(Defendant's Ex. A, at Bates No. 0308).

Sedgwick denied further LTD benefits, and Ms. Martin appealed, providing additional records. The updated file was sent to Dr. Barry Kern for review on August 26, 2004. Ultimately Dr. Kern opined that Ms. Martin should be entitled to benefits through July 6, 2004, but should be denied benefits after July 7, 2004. Dr. Kern's report noted that Ms. Martin's "ischemic heart disease would preclude medium duty work but would allow her to do sedentary to light work as of 7/7/04." Ms. Martin appealed. She submitted additional medical records, but did not include any x-rays, or any records from Dr. Hammer.

On November 4, 2004, an Administrative Law Judge opined that Ms. Martin was disabled for purposes of Social Security benefits. That determination was based largely on Dr. Hall's "assessment that [Ms. Martin] is unable to sustain work activity at any exertional level on a regular and continuing basis due to chronic pain." Also in 2004, Dr. Parks reported that Ms. Martin was not able to work due to her health condition. Dr. Hall sent Sedgwick a letter that stated that Ms. Martin was "not only unemployable by my estimation, but is not expected to improve to any significant degree in the near future."

Sedgwick denied Ms. Martin's appeal by letter dated September 1, 2004, upholding its denial of her claim for benefits after July 7, 2004. Sedgwick relied upon the review of the claim by Dr. Kern, who stated that the treating doctors had "failed to provide substantial objective data" to support their opinion that she is disabled. Dr. Kern further had determined that Ms. Martin may have

been disabled from her regular work as an RN because it is "medium duty work." He stated, however, that although "ischemic heart disease would preclude medium duty work," Ms. Martin would be able to do "sedentary to light work as of 7/7/04."

### III.  DISCUSSION

At issue is the defendants' decision to terminate benefits to the plaintiff under Ascension's long-term disability plan after July 6, 2004, when the definition of disability changed from disabled from her usual occupation of nursing to the inability to perform "any Gainful Work or Service." The more restrictive definition controls the payment of benefits after a Plan participant has been disabled for 24 months from her regular occupation. It is undisputed that the denial was based on a finding that Ms. Martin failed to demonstrate objective evidence that she was disabled from any gainful employment. The parties do not dispute that Ms. Martin provided evidence that she was disabled from performing her job as a nurse, which required "medium duty" activities. The dispute arises from whether she demonstrated to the defendant that she was disabled from performing even light duty, sedentary work.

#### A.  ERISA Review Standard

Initially, the court must determine the proper standard of review for the interpretation of the Plan. As a general rule, the denial of ERISA benefits is subject to *de novo* review, unless the plan gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948,

103 L. Ed. 2d 80 (1989). If the plan gives that discretion to the administrator, the standard of review becomes an "arbitrary and capricious" standard. Id. Under the arbitrary and capricious standard, the court must determine "whether there was a reasonable basis for the decision [to deny benefits], based on the facts as known to the [fiduciary] at the time the decision was made." Brown v. Blue Cross & Blue Shield, 898 F.2d 1556, 1559 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040, 111 S. Ct. 712, 112 L. Ed. 2d 201 (1991), quoting Jett v. Blue Cross & Blue Shield, 890 F.2d 1137, 1139 (11th Cir. 1989). If, however, the fiduciary acts under a conflict of interest, in which the decision allowing benefits to the participant is at odds with the fiduciary's own financial interests, the court employs a heightened standard in which the burden shifts to the administrator to show that the interpretation of the plan was not tainted by self-interest. Lee v. Blue Cross/Blue Shield, 10 F.3d 1547, 1552 (11th Cir. 1994).

   The defendant argues, and the court agrees, that Ascension has the requisite discretionary authority and that the "arbitrary and capricious" standard applies in this case. There is no evidence from which the court finds it should apply the heightened standard.[5] As discussed below, the court

---

[5] See, e.g., Brown v. Blue Cross and Blue Shield, 898 F.2d 1556, 1561-64 (11th Cir. 1990), and cases cited therein (discussing the conflict that often arises when an insurance company both acts as fiduciary and pays benefits from its own assets rather than from a trust or pool, and noting that the standard generally can be viewed as a "range" rather than a "point"). In this case, the undisputed evidence is that Ascension funds a trust from which the claims are paid, and that the Plan provides Sedgwick with discretion "to decide all questions relating to the eligibility of Employees." Although plaintiff argues that a conflict exists, there is no evidence that Sedgwick had a conflict of interest like that described in Brown. The existence of the trust eliminates the potential for a conflict because the benefits are not paid out the assets of Ascension, but out of a fixed trust funded by employer and employee contributions. See Administrative Record, vol. 1, Tab1. Cf. Gilley v. Monsanto Co., Inc., 490 F.3d 848 (11th Cir. 2007). Plaintiff further argues, inexplicably, that the heightened standard should not be applied. The facts presented here simply do not require the court to address the heightened standard.

finds that the plaintiff has failed to show the existence of a genuine issue of material fact as to whether defendant's denial of benefits to her was proper under an "arbitrary and capricious" standard, because she never presented the defendant with any objective evidence of her degenerative joint disease, and because the objective evidence indicated that her other diseases were substantially under control, rendering her able to perform work at a sedentary or light-duty job.

Under the deferential "arbitrary and capricious" standard, the court may not substitute its judgment for that of the administrator, unless the administrator's determination is "arbitrary." The first step in the process is for the court to reach its own determination whether the administrator's interpretation of the plan is "wrong." HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001). In doing so, ambiguities in the plan document are construed against the drafter, usually the administrator or plan sponsor. Id. at 994 n. 24 ("[T]he principle of *contra proferentem* requires that ambiguities be construed against the drafter of a document; as such, the claimant's interpretation is viewed as correct"). Next, "[i]f the court determines that the claims administrator's interpretation is 'wrong,' the court then proceeds to decide whether 'the claimant has proposed a "reasonable" interpretation of the plan.' Lee v. Blue Cross/Blue Shield, 10 F.3d 1547, 1550 (11th Cir. 1994)." Id. at 994. But even if the claimant's interpretation is reasonable, it still must be shown that the administrator's is unreasonable. The court of appeals has explained:

> To find a claims administrator's interpretation arbitrary and capricious, the court must overcome the principle of trust law [footnote omitted] which states that a trustee's interpretation will not be disturbed if it is reasonable. See Firestone, 489 U.S. at 110-11, 109 S. Ct. at 954 (explaining that when a trustee is granted discretion his interpretation will not be disturbed if it is reasonable). Thus, the next step

13

> requires the court to determine whether the claims administrator's wrong interpretation is nonetheless reasonable. If the court determines that the claims administrator's wrong interpretation is reasonable, then this wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable.

Id. at 994.

A recent opinion of the Eleventh Circuit Court of Appeals set out a six-step analysis for reviewing the denial of benefits from an ERISA plan. In Doyle v. Liberty Life Assurance Co. of Boston, 511 F.3d 1336 (11th Cir. 2008), the court noted that a district court should:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Doyle, 511 F.3d at 1340.

Applying this process to the evidence and facts in the instant case, the court is persuaded that defendants' interpretation of the plan definition of "disability" is not wrong. Moreover, even if the interpretation were deemed wrong, it is neither unreasonable nor arbitrary.

B. "Disability"

It is undisputed that Ms. Martin's benefits were discontinued because the defendants found she was not disabled under the specific definition of "disability" that required a showing that Ms. Martin was unable to perform "any Gainful Work or Service," given her experience and history. The defendant argues that Ms. Martin must meet her burden of demonstrating that she is disabled by offering "objective evidence." The plaintiff argues that the evidence of her continued complaints of pain provide a sufficient basis to support her claim that she is disabled.

The Eleventh Circuit Court of Appeals recently faced a similar situation. The court stated:

> Doyle argues that the district court erred in finding that Liberty Life's denial of her claim for disability benefits was reasonable. Specifically, she argues that it was unreasonable for Liberty Life not to consider her subjective claims of pain and suffering, which she argues are substantiated by her fibromyalgia diagnosis. After reviewing the record, we agree with the district court that Liberty Life's decision was reasonable. We express no opinion on whether it was right or wrong.
>
> Liberty Life considered Doyle's medical records and employed the services of two independent physicians to review those records. It concluded that she did not meet the plan's definition of "disability." We conclude that it was not unreasonable for Liberty Life to disregard Doyle's complaints of intangible pain and suffering. Under ChoicePoint's policy, a plan beneficiary must provide proof that she is disabled in order to obtain LTD benefits. The policy defines "proof" as including "chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits." (R.2-12 at 9) (emphasis added). Therefore, it was reasonable for Liberty Life to rely only on objective medical evidence supporting Doyle's claim, evidence which Liberty Life's reviewing physicians found lacking.

15

> See, e.g., R.1-12 at 278 (statement of Liberty Life's reviewing physician, Dr. Silver, that Doyle's complaints "are not substantiated by objective clinical findings"); R.2-12 at 104 (statement of Liberty Life's reviewing physician, Dr. Truchelut, that Doyle's "subjective reports are disproportionate to the physical, radiological, laboratory, and neurodiagnostic" records). We find no error in the district court's determination that Liberty Life's decision was reasonable.

Doyle, 511 F.3d at 1341-42.

In Doyle, the policy defined the "proof" a claimant must offer as including "objective medical evidence" to support a claim for benefits. The defendant has not pointed to any similar language in the instant Plan, and the court finds none. However, other courts have examined the same question in cases where the Plan apparently makes no specific mention of the necessity of objective evidence, and still have required a claimant to offer more than *subjective* reports of pain and disability. The Eleventh Circuit Court of Appeals has gone so far as to state that where a plan puts the burden on the claimant to prove that she is disabled it "is implicit in the requirement of proof that the evidence be objective." Watts. v. BellSouth Telecommunications, Inc., 218 Fed. Appx. 854, 856 (11th Cir. 2007).

In Corkill v. Hartford Life and Accident Ins. Co., 435 F. Supp. 2d 1192, 1198, (N.D. Fla. 2005), the district court found that a claim administrator's denial of benefits was not "wrong" where the diagnosis of a disability caused by chronic neck pain was "based almost entirely on Corkill's own subjective complaints of pain, rather than on any objective evidence of disability." The court further noted that a "claims administrator is not required to defer to a plaintiff's subjective complaints of pain." 435 F. Supp. 2d at 1198, citing Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376 (6th Cir. 1996).

Objective evidence may be required in order to prove the presence of the illness, as in Corkill, or it may be required to show that the illness renders the plaintiff disabled. See Brucks v. Coca-Cola Co., 391 F. Supp. 2d 1193, 1205 (N.D. Ga. 2005)(noting that objective medical evidence may not be available for some diagnosed illnesses, such as chronic fatigue syndrome, but that objective tests may be performed to show the effects or limitations imposed by the disease).  As the court noted in Brucks, a reliance on objective medical evidence is reasonable in that it "promotes integrity by assuring there is corroboration for a claimant's subjective complaints, thus deterring embellished allegations ... as well as deterring fraud in the claims process." 391 F. Supp. 2d at 1205. Objective evidence may not always be required, and may not exist in some types of cases; objective evidence may be required where the medical reviewers have "identified additional medical evidence that could have been submitted to establish particular diagnoses, but was absent from the record." Muzyka v. Unum Life Ins. Co., 195 Fed. Appx. 904, 911 (11th Cir. 2006).

Plaintiff first argues that the denial of continued benefits was a "wrong" decision because Dr. Petrie "did not hold a teleconference as required," "dismissed the treating cardiologist's findings arbitrarily, and did not seek another cardiologist's opinion."  The plaintiff has failed to demonstrate that there was any requirement that a teleconference be held, or that another cardiologist be consulted.  Moreover, the record does not indicate that the defendant disregarded the cardiologist's report, but rather that he viewed the report as indicating that Ms. Martin's heart problems were not causing her to be unable to work.

Plaintiff's more troubling assertion is that the denial of benefits was improper in that it disregarded her degenerative joint disease and related back pain.  The focus here is on plaintiff's

17

back problems, and not on her heart problems. That is not because the cardiac issues are not serious, but because plaintiff does not dispute that her treating doctors considered her heart disease to be under control and responding to treatment.[6] Her claim that she is unable to perform any gainful work stems primarily from the limitations in sitting, standing, and lifting, which she and her doctors attribute to back pain.

In the instant case, Ms. Martin does not allege that there is no objective medical test that would demonstrate that she suffers from the degenerative joint disease and arthritic changes that she claims have rendered her disabled. She does not dispute that such maladies routinely are diagnosed through X-rays, MRIs or CT scans. She further does not argue that there is no method by which she could obtain objective evidence that she is unable to perform even the duties of a sedentary job. Instead, she relies upon her treating physicians' statements that she is disabled, even though it is clear that those doctors relied primarily on *her* own assessments of her pain, and her own description of a diagnosis from another doctor, whose records were never produced to the defendant. Moreover, it is undisputed that Sedgwick informed plaintiff in its letter of March 22, 2004, that she needed to provide additional evidence to support her claim, and pointed out to her both the absence of any "x-ray reports" or "orthopedic notes" to demonstrate the "presence of neuromuscular impairments," and any "objective clinical findings" to support that she is unable to work.[7] She was invited specifically

---

[6] Although plaintiff disputes the meaning of the term "managed," as used by Dr. Parks, she does not dispute that the records include notations regarding significant improvement, normal stress tests, and "adequate" vascularization.

[7] The court is mindful that an ERISA entity's denial of a claim may be "wrong" or "unreasonable" where the objective evidence is deemed lacking is never mentioned to the claimant. See, *e.g.*, Helms v. General Dynamics Corp., 222 Fed. Appx. 821, n.4 (11th Cir. 2007). There is no evidence here, however, that Ms. Martin was "sandbagged" by some failure to explain to her what

to include "documentation such as CT scans, X-Ray, MRI, EMG, mylogram studies" or other records in support of her claim. She did provide additional records, but never provided Sedgwick with any X-ray, CT scan, MRI, or other objective test to demonstrate either the presence of the degenerative joint disease, or the limitations caused by that condition. While the plaintiff did provide evidence that her treating physicians considered her unable to work, the opinions of those treating physicians are not due any more deference than the opinions of reviewing physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831, 123 S. Ct. 1965, 1970, 155 L. Ed. 2d 1034 (2003).[8] The evidence here suggests that Sedgwick did not unreasonably ignore or disregard the treating physicians' findings. Rather, Sedgwick sought some verification that the underlying diagnosis was reliable, but plaintiff provided none. It was not unreasonable of Sedgwick, in the absence of *any* records of any sort from Dr. Hammer, who allegedly diagnosed the back ailment, to find that the plaintiff had failed to demonstrate that she was disabled.

In this case, the interpretation of the definition of "disability" used by defendants is strict, but cannot be found to be "wrong." Moreover, even if Sedgwick's assessment of plaintiff was "wrong," it was not unreasonable. Because Sedgwick had the discretion to review the claim, and because there exists no conflict of interest, its actions are reviewed under the "arbitrary and capricious" standard. Doyle, 511 F.3d 1336. It was not "arbitrary of capricious" of Sedgwick to conclude that plaintiff had

---

type of evidence might be useful in supporting in claim.

[8] The weight given to an opinion of a treating physician is greater in the context of an application for Social Security benefits, which requires that an Administrative Law Judge give special weight to the opinions of the treating physician. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)(2002). For that reason, plaintiff's argument that she must be disabled under the Plan because she has been awarded disability payments under Social Security is unavailing. There are two different standards of proof at work.

not adequately shown the disabling nature of her degenerative joint condition. There were no medical records from the doctor who purportedly diagnosed the condition (Dr. Hammer), and no other doctors undertook any objective diagnostic tests to establish either the disease or its allegedly disabling impact. In the absence of such evidence, it was not unreasonable for Sedgwick to conclude that plaintiff had not proven the existence of this disability.[9] Having reviewed all the evidence and arguments supplied by the parties, the court finds that the administrator's denial of benefits was not wrong and that reasonable grounds supported the decision. Accordingly, the motion for summary judgment is due be to granted.

## IV. CONCLUSION

Based on the foregoing undisputed facts and legal conclusions, the defendant's motion for summary judgment (court document #22) is due to be granted and plaintiff's claims are due to be dismissed with prejudice. A separate order will be entered contemporaneously herewith.

DATED this 31st  day of March, 2008.

_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

---

[9] Even if the argument is made that the nature of plaintiff's disability stems from the combination of her heart disease and degenerative joint disease, this argument still relies on proof of the existence and extent of the latter condition, and that is what is lacking from plaintiff's evidence. It is entirely possible that a person with both of these conditions is more likely disabled that a person with only one of these conditions. But this still requires proof of the existence of *both* conditions.